**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **PAMELA S. HAYWOOD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:14-00092** |
| | ) | **Judge Nixon/Brown** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **ACTING COMMISSIONER** | ) | |
| **OF SOCIAL SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**To: The Honorable John T. Nixon, Senior United States District Judge.**

### REPORT AND RECOMMENDATION

This action was brought under 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the final decision of the Social Security Administration (SSA) through its Commissioner, denying plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 416(i) and 423(d). For the reasons explained below, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 7) be **DENIED**, and the Commissioner's decision **AFFIRMED**.

### I. PROCEDURAL HISTORY

Plaintiff filed for DIB on September 13, 2011 (Doc. 5, pp. 32-33, 112-13),[1] alleging an amended disability onset date of June 17, 2004. (Doc. 5, pp. 12, 30-31) Plaintiff claimed that she was unable to work because of numbness in her left leg and toes, neck and back pain. (Doc. 5, pp. 37-38, 40) Her date last insured (DLI) was March 31, 2005. (Doc. 5, pp. 32-33, 37, 40)

---

[1] References to page numbers in the administrative record (Doc. 5) are to the page numbers that appear in bold in the lower right corner of each page.

Plaintiff's application for benefits was denied initially on October 22, 2011, and upon reconsideration on January 9, 2012. (Doc. 5, pp. 32-37, 39-40) On February 14, 2012, plaintiff requested a hearing before an administrative law judge (ALJ). (Doc. 5, p. 44) A hearing was held in Cookeville on May 6, 2013 before ALJ K. Dickson Grissom. (Doc. 5, pp. 21-31) Plaintiff was represented at the hearing by attorney John Allen. (Doc. 5, pp. 21, 23) Vocational Expert (VE) James Flynn, Ed.D. was present at the hearing. (Doc. 5, pp. 21, 23)

The ALJ entered an unfavorable decision on July 2, 2013 (Doc. 5, pp. 9-20), after which plaintiff filed a request with the Appeals Council on July 5, 2013 to review the ALJ's decision (Doc. 5, pp. 6-8). The Appeals Council denied plaintiff's request on August 8, 2014 (Doc. 5, pp. 1-5), whereupon the ALJ's decision became the final decision of the Commissioner.

Plaintiff filed a motion for judgment on the administrative record on January 22, 2015. (Doc. 7) The Commissioner responded on March 23, 2015. (Doc. 11) Plaintiff did not reply. This matter is now properly before the court.

## I.  REVIEW OF THE RECORD

### A.  Medical Evidence

Dr. Randolph Cook, M.D., a physician in Newport News, Virginia,[2] treated plaintiff for back and leg pain on October 13, 1999 after she "had a twisting injury walking [her] dogs . . . ." (Doc. 5, p. 195) Dr. Cook's impression was "radicular[3] pain [and] possibly recurrent herniated disc . . . ."[4] Dr. Cook ordered a MRI, which was completed on October 18, 1999. (Doc. 5, p. 194)

---

[2]  As discussed below at p. 10, plaintiff moved to Tennessee from Virginia on December 28, 2007.

[3]  Radicular – "of or pertaining to a root . . . or radicle ['one of the smallest branches of a . . . nerve']." *Dorland's Illustrated Medical Dictionary* 1571 (3rd ed. 2012).

[4]  As discussed below at p. 10, plaintiff testified at the hearing that she had a lumbar laminectomy in 1993, *i.e.*, an "excision of the posterior arch of a vertebra," *Dorland's* at 1003.

Dr. Jeffrey Carlson, M.D., examined plaintiff on October 20, 1999, and diagnosed her with lumbar disc disease and disc herniations based on the October 18th MRI, noting at the time that plaintiff also complained of "left neck" pain. (Doc. 5, p. 193) Dr. Carlson noted further that "a disc protrusion centrally . . . seem[ed] to be pressing on both nerve roots at L5-S1."

Dr. Carlson treated plaintiff on November 9, 1999 for lower extremity sciatica and low back pain. (Doc. 5, p. 189) Plaintiff's examination was "unchanged" from her October 20th visit.

Dr. Carlson treated plaintiff on November 19, 1999 for cervical arthritic changes at C2-3 and C3-4. (Doc. 5, p. 189) Dr. Carlson noted that plaintiff "seem[ed] to have significant spinal disease which may be causing her headaches and neck pain."

Dr. Carlson treated plaintiff on December 8, 1999 for sciatica, numbness of the left lower extremity, and cervical joint disease. (Doc. 5, p. 185) Plaintiff represented that "she [wa]s improving in the lower back and her numbness [wa]s improving in her left lower extremity . . . ."

Dr. Carlson treated plaintiff on December 20, 1999 for bilateral lower extremity numbness. (Doc. 5, p. 184) Dr. Carlson noted that plaintiff had "some lumbar spondylosis that should not be giving her bilateral lower extremity numbness," and recommended an electromyogram (EMG) and nerve conduction studies of her lower extremities to determine the causes/origins of the numbness.

The EMG and nerve conduction studies were performed on December 28, 1999. (Doc. 5, pp. 216-19) The nerve conduction studies were within normal limits, and no peripheral neuropathy[5] seen. (Doc. 5, p. 217) However, the EMG study of the left leg suggested "lumbar 5 radiculopathy[6] . . . ." Dr. Carlson recommended surgical intervention. (Doc. 5, p. 214)

Dr. Carlson treated plaintiff on January 19, 2000 for lower extremity sciatica and L5-S1 disc

---

[5] Neuropathy – "a functional disturbance or pathological change in the peripheral nervous system . . . ." *Dorland's* at 1268.

[6] Radiculopathy – "disease of the nerve roots . . . ." *Dorland's* at 1571.

degeneration.  (Doc. 5, p. 214)  Plaintiff represented that she "[wa]s unable to do normal activities around her home without having significant problems the next day and that she [wa]s unable to do housecleaning or laundry, or gardening without having significant pain in her back."  Plaintiff decided to pursue surgical intervention.

Dr. Carlson performed the following surgery on plaintiff on February 4, 2000, assisted by Dr. Cook: "Posterior laminectomy at L5 . . . laminectomies at L4 and S1 with foraminotomy[7] and decompression at L5 and S1 bilaterally.  Posterior lumbar interbody fusion at L5-S1. Posterolateral[8] L5-S1 fusion with pedicle screw instrumentation."  (Doc. 5, pp. 212-13)

Dr. Carlson saw plaintiff postoperatively on February 15, 2000, and noted that plaintiff "seems to be doing well . . . 10 days status post [surgery]."  (Doc. 5, p. 211)  Plaintiff exhibited 5/5 muscle strength, sensory and motor exam was normal bilaterally in her lower extremities.  Xrays of her spine showed "good alignment of her hardware as well as her bone graft."

Dr. Carlson saw plaintiff postoperatively on April 26, 2000, noting that plaintiff was having no problem in her lower back or legs and, although she has some stiffness in her lower back, "[s]he is quite active."  (Doc. 5, p. 210)  Dr. Carlson noted further that plaintiff had 5/5 muscle strength, sensory motor examination was normal, and xrays revealed "excellent alignment of her lumbar spine as well as her hardware and fusion mass."  Dr. Carlson concluded: she "is doing quite well . . . should be fully active as tolerated . . . [and] . . . continue to increase her activities . . . ."

Dr. Cook saw plaintiff postoperatively on May 4, 2000, and wrote: "Just barely . . . three months after her surgery, she has been walking several miles a day . . . doing a lot of gardening . . . [and] . . . has been increasing this level of activity despite her increasing level of symptoms." (Doc.

---

[7] Foraminotomy – "the operation of removing the roof of an intervertebral foramina ['a natural opening or passage, especially one into or through a bone'], done for the relief of nerve root compression." *Dorland's* at 729, 731.

[8] Posterolateral – "situated posteriorly and to one side." *Dorland's* at 1502.

5, p. 209) Examination revealed that deep tendon responses [DTRs] were present and "symmetric," and plaintiff's "motor strength [wa]s 5/5 throughout." Dr. Cook also noted that he "had a long discussion with her . . . with regard to cutting back on the amount of activity she [wa]s doing."

Dr. Carlson saw plaintiff postoperatively on May 17, 2000. (Doc. 5, p. 208) Dr. Carlson noted that "she is having no problems except some pain around her left hip bone graft site and she is quite active." (Doc. 5, p. 208) He also noted that plaintiff had 5/5 muscle strength, and that her sensory/motor exam was normal.

Dr. Carlson treated plaintiff on August 9, 2000 for "stiffness and pain in the lower back." (Doc. 5, p. 207) Dr. Carlson noted that "overall . . . she is dong quite well," and she is "doing all of her normal activities." Dr. Carlson also noted that plaintiff had been "on a boat fishing," that the "pounding cause[d] some of her back pain" and that, although she was experiencing "[s]ome numbness" in her left foot and toes during the examination, she was not experiencing any "incapacitating back pain . . . ." Dr. Carlson noted further that plaintiff had 5/5 muscle strength, her sensory/motor exam was normal and, although she had some "mild tenderness around her lumbar spine," xrays revealed "excellent alignment of the lumbar spine, as well as her fusion mass."

Dr. Carlson treated plaintiff on August 31, 2000 for left buttocks and left calf pain. (Doc. 5, p. 206) Dr. Carlson noted that plaintiff "returns today saying that her back is actually doing very well," "that she is able to do the yard work and takes half a Percocet . . . about once every couple of days." Dr. Carlson noted further that, although plaintiff had some "tenderness," she "ha[d] a normal sensory and motor examination and full range of motion of the cervical, thoracic, and lumbar spine." Dr. Carlson also recommended that plaintiff lift "less than 50 pounds," and "not drive more than 30 minutes at a time."

Dr. Carlson treated plaintiff on October 9, 2000 for left buttocks pain, left calf pain, and foot

numbness. (Doc. 5, p. 205) Dr. Carlson noted that plaintiff "ha[d] been doing quite a bit of traveling," but was "stable at this point." Plaintiff exhibited "mild tenderness" and "decreased sensation in the left toe," but her sensory/motor examination was normal.

Dr. Carlson treated plaintiff on March 15, 2001 for left lower extremity pain and calf strain. (Doc. 5, p. 204) Plaintiff reported that "she ha[d] been trying to move out of her house, which ha[d] been aggravating her back and . . . giving her some pain down her left lower extremity." Plaintiff also represented that she had "been quite active in her exercise routine . . . ." Dr. Carlson noted that plaintiff "has no straight leg signs[9] and 5/5 muscle strength."

Dr. Carlson treated plaintiff again on April 24, 2001 for left lower extremity pain and calf pain. (Doc. 5, p. 203) Dr. Carlson noted that, although plaintiff had some tenderness, she "ha[d] no straight leg signs and 5/5 muscle strength." He also noted that plaintiff "does not have classic symptoms of radiculopathy in that she does not have significantly palpable pain."

Dr. Carlson treated plaintiff on May 14, 2001 for left lower extremity and calf pain. (Doc. 5, p. 202) Dr. Carlson noted that plaintiff reported "having no problems . . . her left leg seem[ed] to be doing quite well," "she ha[d] no straight leg signs and 5/5 muscle strength," and he cleared her to "be as active as she can tolerate . . . ."

Dr. Carlson next treated plaintiff one year and nine-plus months later on February 20, 2003 when she presented for neck and right arm problems after "her dogs pulled her and she slipped on ice and fell . . . ." (Doc. 5, p. 201) Xrays were normal and, apart from lateral inflammation of the right elbow, her musculoskeletal and neurological examinations were normal as well.

Plaintiff next saw Dr. Carlson nearly one year and four months later on June 17, 2004 – **the**

---

[9] A positive test means that one or more of the nerve roots may be compressed or irritated, the most common cause of which is a herniated disc in the low back.

**alleged initial onset date** – for "right-sided neck pain." (Doc. 5, p. 199) Plaintiff represented that she "pulled a muscle . . . on the right side of her neck . . . after spending the weekend on a boat." Apart from noting "decreased range of motion to the right side and neck pain and tenderness in her right trapezius," plaintiff's musculoskeletal and neurological examinations were normal. Xrays revealed "degenerative disc and facet disease at C3-4, C4-5, and C5-6."

Dr. Carlson examined plaintiff on July 1, 2004 again for "right-sided neck pain." (Doc. 5, p. 198) Plaintiff represented that "her neck pain [wa]s much better," and that "she has improved quite a bit." Apart from "mild tenderness on palpation of the right trapezius muscle," her musculoskeletal and neurological examinations were unremarkable. Dr. Carlson noted that plaintiff was "doing quite nicely," and concluded again that "she can be as active as she would like . . . ."

Plaintiff presented to the Riverside Walter Reed Hospital Emergency Room (ER) in Gloucester, Virginia on May 27, 2005 – **nearly two months after the DLI** – for lower back and right hip pain. (Doc. 5, pp. 238-41) Plaintiff was diagnosed with "lumbo-sacral strain," apparently caused by gardening. (Doc. 5, pp. 238-39) Plaintiff was instructed to follow up with her primary care physician the following week, or to return to the ER if her pain got worse. (Doc. 5, p. 240) There is no evidence in the record that plaintiff did either.

Plaintiff next sought treatment from Dr. Carlson nearly two years later on May 17, 2007, when he treated her for lower back and lower extremity pain. (Doc. 5, p. 235) Dr. Carlson noted that plaintiff had "full range of motion of the cervical, thoracic, and lumbar spine and of the hips, knees, and ankles." Plaintiff exhibited a positive straight leg rise on the left, but crossed straight leg rising tests were negative.[10] Neurologically, plaintiff exhibited "no weakness in the thoracic, lumbar,

---

[10] If a straight leg raise test is positive, then the test is repeated with the opposite leg. If this "crossed leg straight leg rise" is positive, *i.e.*, if it produces pain, then there is an increased likelihood that nerve root compression/irritation is the cause of the low back pain.

or sacral spine or in the lower extremities of [the] hips . . . [DTRs] are . . . normal bilaterally . . . [and] . . . [a]nkle and knee jerks[11] are normal . . . ."  Xrays "reveal[ed] excellent alignment of the lumbar spine hardware and anatomy with excellent healing."  Dr. Carlson ordered a MRI "to rule out L4-5 disk herniation," which was completed on May 23, 2007.  (Doc. 5, p. 234)  The MRI revealed, among other things, "evidence of the previous surgery with adequate posterior decompression."

Dr. Carlson examined plaintiff on May 24, 2007 for low back pain, left lower extremity pain, and spinal stenosis at L4-5.  (Doc. 5, p. 233)  Dr. Carlson's impression was that the MRI "reveal[ed] L4-5 moderate spinal stenosis and a well-healed L5-S1 fusion."  Dr. Carlson noted that "the thoracolumbar[12] spine has normal kyphosis[13] . . . no scoliosis . . . full range of motion of the cervical, thoracic and lumbar spine and the hips, knees, and ankles . . .  mildly positive straight leg raise on the left . . . [but her] . . . [c]rossed straight leg raising test [we]re negative." Dr. Carlson noted "no weakness in the thoracic, lumbar or sacral spine or in the lower extremities or hips . . . [DTRs] are present and normal bilaterally . . . [and] . . . [a]nkle and knee jerks are normal . . . ."

Dr. Carlson treated plaintiff for lower back pain and spinal stenosis again on June 26 and September 11, 2007 (Doc. 5, pp. 230-31).  Dr. Carlson observations were the same on both dates. Plaintiff's thoracolumbar spine exhibited normal kyphosis and no scoliosis, she had "full range of motion of the cervical, thoracic, and lumbar spine and of the hips, knees, and ankles . . . [and her] . . . [s]traight leg rising and crossed straight leg risings . . . [w]ere negative . . . ."  Plaintiff had "no weakness in the thoracic, lumbar, or sacral spine or in the lower extremities or hips . . . [DTRs]

---

[11]  Jerk – " sudden reflex or involuntary movement." *Dorland's* at 971.

[12]  Thoracolumbar – "pertaining to the thoracic and lumbar parts of the spine." *Dorland's* at 1920.

[13]  Kyphosis – "abnormally increased convexity in the curvature of the thoracic vertebral column as viewed from the side." *Dorland's* at 992.

[we]re present and normal bilaterally . . . [a]nkle and knee jerks [we]re normal . . . ."

As discussed below at p. 10, plaintiff moved from Virginia to Tennessee on December 28, 2007. After moving to Tennessee, plaintiff sought medical care at the Convenient Health Care Clinic (Convenient Health Care) in Cookeville. Plaintiff presented to Convenient Health Care for lower back pain the first time on October 23, 2009. (Doc. 5, pp. 228-29) She told the nurse that her "'back goes out about once a year.'" Plaintiff presented to Convenient Health Care for low back pain again on January 28, 2010, November 3, 2011, October 12, 2012, and February 4, 2013. (Doc. 5, pp. 220-21, 226-27, 249-52) The clinical notes in these records are based solely on plaintiff's subjective complaints.

Dr. Carlson completed a lumbar spine residual functional capacity questionnaire (RFC questionnaire) on May 7, 2012, identifying "[p]ain in the back, neck, [and] legs" as plaintiff's symptoms. (Doc. 5, pp. 242-45) Dr. Carlson determined that plaintiff: 1) was able sit for more than 2 hrs. at a time before having to stand; 2) could stand for more than 2 hrs. at a time before having to sit; 3) could sit at least 6 hrs. in an 8-hr. workday; 4) was able to stand/walk at least 6 hrs. in an 8-hr. workday; 5) needed to walk around approximately every 10 mins. in an 8-hr. workday; 6) could twist, stoop, bend, crouch, squat, climb ladders, and climb stairs occasionally, but was able to handle and finger without limitation. (Doc. 5, pp. 243-45) Dr. Carlson also noted that plaintiff's medications had no side effects, *i.e.*, dizziness, drowsiness, etc. (Doc. 5, p. 243)

### B. Hearing[14]

Plaintiff testified that she worked first as an infusion therapy therapist with cancer patients, that she "covered the state of Virginia, and . . . would travel 62, 64,000 a year." (Doc. 5, p. 26)

---

[14] The excerpts of the transcript of the hearing addressed below are those necessary to support the court's analysis of plaintiff's claims of error. The remainder of the transcript of the hearing is incorporated herein by reference.

After having a lumbar laminectomy in 1993, she went into "pharmaceutical sales for a localized territory." Plaintiff moved from Bumpass, Virginia to Newport News where she "could stay local and not drive . . . ." (Doc. 5, pp. 26-27) Plaintiff testified that she was unable to do that work because "in medical sales you stand a lot, you sit a lot, and my back just totally went out . . . ." (Doc. 5, p. 27) Plaintiff testified further that she moved to Tennessee on December 28, 2007. (Doc. 5, p. 29) Plaintiff admitted at the hearing that she had not established a patient-client relationship with any physician in the five-plus years since moving to Tennessee, and that the only medical care she had received was at Convenient Health Care. (Doc. 5, p. 30)

### C. The ALJ's Notice of Decision

Under the Act, a claimant is entitled to disability benefits if she can show her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905. Corresponding regulations outline the five-step sequential process to determine whether an individual is "disabled" within the meaning of the Act. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374-75 (6th Cir. 2014). While the claimant bears the burden of proof at steps one through four, the burden shifts to the Commissioner at step five to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (RFC) and vocational profile. *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

### III. ANALYSIS

### A. Standard of Review

The district court's review of the Commissioner's final decision is limited to determining

whether the Commissioner's decision is supported by substantial evidence in the record, and whether the decision was made pursuant to proper legal standards. 42 U.S.C. § 405(g); *Gayheart*, 710 F.3d at 374. Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see Gentry v. Comm's or Soc. Sec'y*, 741 F.3d 708, 722 (6th Cir. 2003). The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence supports a different conclusion. *Gayheart*, 710 F.3d at 374.

### B. . Claims of Error

### 1. Whether the ALJ Erred in Determining that Plaintiff Did Not Have an Impairment or Combination of Impairments That Met or Medically Equaled the Severity of One of the Listed Impairments in 20 CFR Part 404, Subpart P, Appendix 1 (Doc. 8, pp. 6-9)

Plaintiff asserts three arguments in support of her first claim of error: 1) the "injury to her lower back manifests all the specific medical criteria *for Listing 1.04*" (bold and italics in the original); 2) the ALJ's step three analysis was "perfunctory and superficial"); 3) she has "presented medical findings that show symptoms or diagnosis equal in severity and duration . . . 'to all the criteria for the one most similar listed impairment.'"

The listing of impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 describes impairments that the SSA considers "severe enough to prevent an individual from doing any gainful activity, regardless of her age, education, or work experience." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 653 (6th Cir. 2009)(citing 20 C.F.R. § 404.1525(a)) "For a claimant to show that h[er] impairment matches a listing, it must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)(italics in the original); *see* 20 C.F.R. § 416.925(c)(3). This means that plaintiff must present "medical findings equal in severity to all the criteria for the one most similar

listed impairment." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001)(quoting *Sullivan*, 493 U.S. at 531). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530.

Listing 1.04 in 20 C.F.R. Pt. 404, Subpt. P, App. 1, on which plaintiff relies, pertains to "[d]isorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoidits, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root . . . of the spinal cord." Plaintiff argues in particular that "the proof is compelling . . . [she] has met the requirements of Listing 104A." Listing 104A reads as follows:

> A. Evidence of nerve root compression characterized by neuro-anatomic[15] distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) . . . .

There is a single diagnosis of nerve root compression in the medical record for the relevant period of time. In his October 20, 1999 clinical note, Dr. Carlson wrote: "disc protrusion . . . seems to be pressing on both nerve roots at L5-S1." However, Dr. Carlson resolved the compression issue surgically on February 4, 2000, following which imaging consistently revealed proper alignment and healing of plaintiff's lumbar spine. Fast forward beyond the relevant time period, the MRI on May 23, 2007 showed that "[a]t L5-S1 there is **evidence of the previous surgery with adequate posterior decompression**." (emphasis added) In other words, nearly two years after the relevant period, and more than seven years after the original surgery, objective medical evidence shows no disc compression at L5-S1, the obvious inference being that there was no disc compression during

---

15 Neuro – "denoting relationship to a nerve or nerves . . . ." *Dorland's* at 1263. Anatomic – "pertaining to anatomy, or to the structure of an organism." *Dorland's* at 76. The expression "neuro-anatomic distribution of pain" in Listing 104A is, in medical terms, lumbar radiculopathy, which is defined as "any disease of lumbar nerve roots, such as from disk herniation or compression . . . with lower back pain . . . ." *Dorland's* at 1571.

the relevant time period. This conclusion is supported by the fact that there is no evidence during the intervening seven-plus years – from October 1999 to May 2007 – that plaintiff underwent any medical procedure(s) to decompress the pressure at L5-S1 other than her surgery on February 4, 2000.

The medical evidence discussed above shows that there was no nerve root compression during the relevant time period of time. As there was no compression of the nerve root, there could have been no neuro-anatomic distribution of pain due to compression. Moreover, as discussed at length above at pp. 4-9, plaintiff repeatedly demonstrated no loss of range of motion of the spine, no motor loss, *i.e.*, weakness or muscle weakness, no sensory or reflex loss and, except for May 17 and 24, 2007 – both dates well after the relevant period of time – when she had a positive/mildly positive straight leg rise on the left, her straight-leg raises were consistently negative. In short, plaintiff's condition/symptoms did not satisfy *any* of the requirements of Listing 104A.

Plaintiff argues next that the ALJ's analysis at step three was "perfunctory and superficial." The ALJ's analysis is quoted below in its entirety.

> No treating or examining physician has suggested the presence of any impairment or combination of impairments of listing level severity. The undersigned has given special consideration to listings relative to musculoskeletal impairments (Listing 1.04) and does not find the presence of any criteria set forth in said listings to warrant finding that the claimant meets or equals any listing.

(Doc. 5, p. 15) The language of 20 C.F.R. § 404.1526 does not require the ALJ to articulate his step three analysis at length, only that he review all evidence to see if the sum of the impairments is medically equivalent to a listed impairment. *Bledsoe v. Barnhart*, 165 Fed.Appx. 408, 411 (6th Cir. 2006). Moreover, the Sixth Circuit has determined that where, as here, the ALJ's step three analysis is brief, it is permissible to look elsewhere in the decision to affirm his step-three medical equivalency determination. *See Forrest v. Comm's of Soc. Sec*., 591 Fed.Appx. 359, 366 (6th Cir.

2014)(citing *Bledsoe*, 165Fed.Appx. at 411).

The Magistrate Judge notes here as an initial matter that the ALJ's assessment at step three was spot on as written. First, "[n]o treating or examining physician ha[d] suggested the presence of any impairment or combination of impairments of listing level severity." Dr. Carlson did not, nor did any other treating/examining source. The ALJ's statement is, therefore, a statement of fact. Second, as discussed above at pp. 12-13, plaintiff's alleged conditions/symptoms did not "meet[] or equal[] any listing." Consequently, the ALJ's listing-related statement above at p. 13 is correct for that reason as well. The remaining questions are whether the ALJ's assessment was based on all the evidence, and whether his step three analysis would be clear on subsequent review. As shown below, the answer is "Yes!" on both counts.

The ALJ stated on at least three occasions that his decision was based on a "careful consideration of the entire record," or words to that effect. (Doc. 5, pp. 14-16) A review of the ALJ's RFC analysis shows that the ALJ also considered: 1) plaintiff's testimony at the hearing; 2) Dr. Carlson's medical records from 2000 to 2007; 3) the results of objective medical testing; 4) plaintiff's physical examinations, her reported activities, and Dr. Carlson's impressions of her condition; 5) Dr. Carlson's May 7, 2012 RFC questionnaire; 6) the written statements of Patti Erb and Lynn Hall, plaintiff's friends. A plain reading of the ALJ's assessment shows that it was based on the relevant evidence. It shows that his analysis was thoughtful, complete, and clear.

Finally, the plaintiff alleges that she "presented medical findings that show symptoms or diagnosis equal in severity and duration . . . 'to all the criteria for the one most similar listed impairments.'" Plaintiff fails to provide any argument, factual allegations, or reference to the record in support of this argument. Consequently, this argument is waived. *See Moore v. Comm'r of Soc. Sec.*, 573 Fed.Appx. 540, 543 (6th Cir. 2014)(citing *United States v. Stewart*, 628 F.3d 246, 256 (6th

Cir. 2010)("Issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

Plaintiff's first claim of error is without merit.

### 2. Whether the ALJ's Determination that Plaintiff Could Return to Her Past Relevant Work is Supported by Substantial Evidence (Doc. 8, pp. 9-12)

Plaintiff makes the following arguments in support of her second claim of error: 1) the ALJ's determination that she had the RFC to perform her past relevant work was not supported by substantial evidence; 2) the ALJ failed to consider that her medication resulted in drowsiness and lack of concentration which prevented her from driving safely; 3) the ALJ ignored the mental demands of her past work; 4) the ALJ did not obtain sufficient documentation to support his decision; 5) the ALJ's determination was not logical or orderly, nor did it contain basic factual findings; 6) the ALJ failed to obtain any testimony from the VE, or "cite to any job descriptions in the Dictionary of Occupational Titles . . . ."

At issue here is the past relevant work that the ALJ determined plaintiff was capable of performing, *i.e.*, "work as a medical equipment sales representative (DOT number 276.257-010)." (Doc. 5, p. 17) The DOT describes that work as follows:

> Sells medical and dental equipment and supplies, except drugs, to doctors, dentists, hospitals, medical schools and retail establishments: Studies data describing new products to develop sales approach. Compiles data on equipment and supplies preferred by customers. Advises customers of equipment for given needs based on technical knowledge of products. Provides customers with advice in such areas as office layout, legal and insurance regulations, cost analysis, and collection methods to develop goodwill and promote sales . . . .

DICOT 276-257-010 (1991 WL 672509 * 1).

Turning to plaintiff's first argument, the only medical treatment that plaintiff received during

15

the relevant period of time was for neck pain, with respect to which Dr. Carlson concluded on July 1, 2004 that "she can be as active as she would like . . . ." Clinical notes prior to that show that: 1) Dr. Carlson noted on April 26, 2000 that plaintiff was "quite active, and that she "should be fully active as tolerated . . . [and] . . . continue to increase her activities . . . ."; 2) Dr. Cook noted on May 24, 2000 that plaintiff "has been walking several miles a day and doing a lot of gardening"; 3) Dr. Carlson noted on August 9, 2000 that Plaintiff was "doing all of her normal activities," and had gone out on a fishing boat; 4) Dr. Carlson noted on August 31, 2000 that plaintiff "says she is able to do the yard work . . . ," but he advised her to limit her lifting to less than 50 lbs. and not to drive more than 30 minutes at a time; 5) Dr. Carlson noted on October 9, 2000 that plaintiff "ha[d] been doing quite a bit of traveling"; 6) Dr Carlson noted on March 15, 2001 that Plaintiff had "been trying to move out of her house," and that she has "been quite active in her exercise routine"; 7) Dr. Carlson noted on April 4, 2001 that plaintiff "does not have classic symptoms of radiculopathy in that she does not have significantly palpable pain"; 8) Dr. Carlson noted on May 14, 2001 that plaintiff is having "no problems . . . her left leg seems to be doing quite well." As discussed above at pp. 4-7, plaintiff's musculoskeletal and neurological examinations were consistently normal/unremarkable during this period of time, and imaging of her lumbar spine repeatedly showed proper alignment and healing. The foregoing constitutes substantial evidence that plaintiff's RFC did not preclude her from performing past relevant work.

Plaintiff asserts in her second argument that the ALJ failed to consider that her medication resulted in drowsiness and lack of concentration which prevented her from driving safely. Dr. Carlson noted in his RFC questionnaire that plaintiff's medications had no side effects. Moreover, there is nothing in the medical evidence of record to that effect.

Plaintiff asserts in her third argument that the ALJ ignored the mental demands of her past

relevant work.  Plaintiff has failed to provide any argument, factual allegations, reference to the record, or citation to relevant authority in support of this argument.  Therefore, this argument is waived for reasons previously explained.

In her fourth argument, plaintiff alleges that the ALJ did not obtain sufficient documentation to support his decision.  Plaintiff was represented by counsel at all times relevant in the proceedings below.  Accordingly, the ALJ had no obligation to develop the record for her.  *See Bass v. McMahon*, 499 F.3d 506, 514 (6th Cir. 2007).

Plaintiff asserts in her fifth argument that ALJ's determination was not logical or orderly, nor did it contain basic factual findings.  More particularly, plaintiff argues that "the ALJ's RFC assessment is not based on substantial evidence, nor does it support the ALJ" assessment that she is capable of performing past relevant work.  The analysis above and at p. 16 shows that, not only was the ALJ's RFC assessment supported by substantial evidence, so too was his determination that she was capable of performing past relevant work.

Finally, plaintiff asserts that the ALJ failed to obtain any testimony from the VE, or "cite to any job descriptions in the Dictionary of Occupational Titles."  It is discretionary whether the ALJ uses the services of a VE.  *See* 20 C.F.R. 404.1560(b)(2).  Consequently, there is no error for not doing so.  As far as the second part of this argument, the ALJ referred specifically to "medical equipment sales representative (DOT number 276.257-010" in the decision.  (Doc. 5, p. 7)  Accordingly, this part of her argument lacks basis in fact.

Plaintiff's second claim of error is without merit.

### 3. Whether the ALJ's Credibility Determination is Supported by Substantial Evidence (Doc. 8, pp. 12-15)

Plaintiff asserts that the ALJ's credibility determination is not supported by substantial

evidence. He also argues that "the ALJ made improper credibility . . . findings and ignored the directives of **SSR 96-7p**, and instead relied upon boilerplate language," and that the "ALJ failed to explain how the medical evidence supports h[is] credibility finding and failed to conform h[is] credibility finding to **SSR 97-7p**." (emphasis in the original)

Credibility determinations rest with the ALJ, and are afforded great weight and deference as long as they are supported by substantial evidence. *See Torres v. Comm'r of Soc. Sec.*, 490 Fed.Appx. 748, 755 (6th Cir. 2012). An ALJ's credibility assessment will not be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). The ALJ is, however, required to "explain his credibility determinations in his decision such that it 'must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007); 20 C.F.R. § 404.1529(c)(quoting SSR 96–7p, 1996 WL 374186 at * 3 (SSR)).

A plain reading of the decision reveals that the ALJ identified SSR 96-7p as the applicable standard, and that he correctly noted his duties under that ruling. (Doc. 5, p. 15) A plain reading of the decision also shows that the ALJ explained his credibility determination and in so doing took specific note of the following facts: 1) on May 24, 2000, plaintiff reported "walking several miles a day and doing gardening"; 2) on August 9, 2000, she reported being "out on a fishing boat"; 3) on August 31, 2000, Dr. Carlson instructed plaintiff not to lift more than 50 lbs. or drive more than 30 mins. at a time; 4) on May 14, 2001, she reported having no problems and her left leg seemed to be "doing quite well" after seeking treatment for leg pain three weeks before on April 24, 2001; 5) on June 17, 2004, xrays revealed "degenerative disc disease and facet degenerative disease; 6) on July 1, 2004, Dr. Carlson noted that plaintiff was "'doing quite nicely,'" and "'[a]t this point, she can be

as active as she would like . . . .'"[16] (Doc. 5, p. 16)  The ALJ also noted that examination findings were normal during the period, and that there was "no evidence of any treatment after that time until May 2005, after her date last insured . . . ."  (Doc. 5, p. 16)  Based on the foregoing, the ALJ determined that "claimant's activities, and examination findings are not consistent with the disabling limitation prior to March 31, 2005, the date she was last insured for benefits."  (Doc. 5, p. 16)

The analysis above shows that the ALJ's credibility decision was supported by substantial evidence.  The foregoing analysis also shows that the ALJ did not rely on boiler plate language as plaintiff alleges, and that his analysis makes it clear to plaintiff and any subsequent reviewers the reasons for his determination.

Plaintiff also argues that the ALJ erred in his consideration of parts of the record.  First, plaintiff asserts that had the ALJ read "Dr. C[ook]'s[17] medical records more carefully," he "would have . . . noted that [plaintiff's]  physician instructed her to reduce and limit her activities" on May 4, 2000.  (Doc. 8, p. 14)  Second, plaintiff asserts that the ALJ "attacked" plaintiff because she reported on August 9, 2000 that she had gone out on "a fishing boat."

While it is tempting to address the two arguments above on the merits, the Magistrate Judge assumes for the sake of argument/brevity that the ALJ erred in his consideration of these two events.  That said, when an ALJ relies on invalid reasons for discounting credibility, such consideration amounts to harmless error so long as substantial evidence supports the ALJ's conclusions on credibility.  *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012).  The discussion above at pp. 18-19 provides substantial other evidence to support the ALJ's credibility decision, as do the

---

[16]  Although the ALJ addressed the results of imaging, appearance of personal well-being, and musculoskeletal and neurological examinations after the DLI, such records are not necessary to this analysis because they do not pertain to the relevant time period.  Accordingly, the ALJ's assessment of those records will not be addressed.

[17]  Plaintiff mistakenly names Dr. Carlson as the physician connected with this event.  The physician actually was "RBC," *i.e.*, Dr. Cook, who sent a copy of the clinical note to Dr. Carlson.

many other records addressed above at pp. 4-9. Therefore, any error that the ALJ may have committed in considering these two reported events against plaintiff's credibility is harmless.

Plaintiff's third claim of error is without merit.

### 4. Whether the ALJ Erred by Ignoring Dr. Carlson's Opinion as to Plaintiff's Anticipated Absences from Work (Doc. 8, p. 15)

Plaintiff asserts in her final claim of error that, "whether or not [she] would likely be absent from work two days a month . . . requires a medical judgment . . . ." (Doc. 8, p. 15) Plaintiff argues that the ALJ played doctor in deciding not to accredit Dr. Carlson's opinion that plaintiff could be expected to miss two days of work,[18] and that the ALJ's opinion is "contradicted" by the medical evidence of record.

The ALJ's determination with respect to this claim of error was as follows: "No weight is given to Dr. Carlson's opinion that [plaintiff] was likely to be absent from work two days a month, as his treatment notes do not show that she reported experiencing severe pain during that time, nor did she have medical office visits two days a month." (Doc. 5, p. 16) Dr. Carlson's opinion, to which the excerpt of the ALJ's decision above pertains, appears in the RFC questionnaire in which Dr. Carlson checked the box labeled "[a]bout two days per month" in response to the question, "on the average, how many days per month [will] your patient . . . likely be absent from work as a result of [her] impairments . . . ." (Doc. 5, ¶ 11., p. 245)

The law is well established that the ALJ may not substitute his own medical opinion for that of a physician. *See Rudd v. Comm'r of Soc. Sec.*, 531 Fed.Appx. 719, 726 (6th Cir. 2013)(citations omitted). That said, an "ALJ is charged with the responsibility of evaluating the medical evidence."

---

[18] Plaintiff does not argue that the ALJ violated the "treating physician" rule, only that he substituted his judgment for Dr. Carlson's and, in so doing, played doctor. Because this claim of error is not couched in the context of the "treating physician" rule, the Magistrate Judge will not address it as such.

*See Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004).  An ALJ "does not improperly assume the role of a medical expert by weighing the medical and non-medical evidence before rendering an RFC finding." *Coldiron v. Comm'r of Soc. Sec.*, 391 Fed.Appx. 435, 439 (6th Cir. 2010)(citations omitted).

A plain reading of the ALJ's decision shows that he was weighing the evidence before him, not interpreting raw medical data, and not playing doctor.  As to plaintiff's argument that "the ALJ's 'medical' opinion is contradicted by evidence of record," plaintiff fails to provide any argument, factual allegations, or reference to the record in support of this argument.  Consequently, this part of her argument is waived for reasons previously explained.

Plaintiff's fourth claim of error is without merit.

### IV. RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 7) be **DENIED**, and the Commissioner's decision **AFFIRMED**.  The parties have fourteen (14) days of being served with a copy of this R&R to serve and file  written objections to the findings and recommendation proposed herein.  A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof.  Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal.  *Thomas v. Arn*, 474 U.S. 140, 142, *reh'g denied*, 474 U.S. 111 (1986); *Alspaugh v. McConnell*, 643 F.3d 162, 166 (6th Cir. 2011).

**ENTERED** this 4th day of March, 2016.


/s/ Joe B. Brown_____
Joe B. Brown
United States Magistrate Judge